May it please the court. Good morning, Your Honors. My name is James Kuhl, and I represent Estella Medrano, the appellant. I understand it is my responsibility to manage my time, and I'd like to reserve any time I have remaining for rebuttal. Estella Medrano was arrested and held in state custody for almost six months for an armed robbery she did not commit, and with which she had nothing to do. Ultimately, Ms. Medrano was released from jail and released from police custody when prosecutors dismissed the charges against her, quote, in the interest of justice, because frankly there was not evidence to proceed. That's not the same as the insufficiency of the evidence. It is not. Okay. Fair point, Your Honor. Subsequently, Ms. Medrano filed suit under Section 1983 for unlawful imprisonment against the officers who arrested her, alleging that there was not probable cause for her arrest. It is the palace's position that the court below erred inasmuch as the court granted summary judgment to the defendant's officers on the theory that an objectively reasonable police officer would have believed they had probable cause to arrest Ms. Medrano, notwithstanding the fact that the district court recognized that there were material disputes of fact with respect to the, quote, historical facts underlying the determination of probable cause. This distinction is important. At the outset, if the question is simply whether or not the material facts underlying probable cause are disputed, well, then that is a question for the jury. And I think the case law is clear, Your Honors, that when that is the question, probable cause and the facts underlying it and any disputes regarding those facts must be found and determined by a jury and not the court. Well, are there really disputed facts or are there disputed inferences? Exactly, Your Honor. That's precisely the point. But the point is that the facts aren't in dispute. There's the videos that show what happened. There's all of the other facts. Tell us what fact is in dispute as opposed to inferences or legal conclusions from the facts. I believe there are a host of facts in dispute, Your Honor. But I believe your point is well taken in that the principal question we're concerned with are whether or not the inferences that were drawn were properly drawn and whether they were drawn reasonably. So I do think the Court is very correct. And I'll focus my arguments on those points. There may be facts that are disputed by appellee, which I'd be happy to address in rebuttal, but I don't want to get us into the weeds discussing something that may not be relevant. Directing our attention to the inferences, I guess I drew the distinction for this reason. Once the Court makes the determination that despite the existence of factual disputes or disputed inferences on those facts, the Court can nonetheless grant qualified immunity if the Court finds that the officer's actions were, or their belief in probable cause, was objectively reasonable. And this is an important distinction. I know the Court knows the difference, so I won't belabor the point. But it is not subjective reasonableness. The standard doesn't question whether or not the defendant officers in their minds had a good faith belief in probable cause. It doesn't matter if they believed erroneously but sincerely that they had probable cause. For this reason, and the reason I make the distinction, the Court was required to consider facts that contradicted the inferences that it drew, which I argue were drawn improperly, which I'll discuss in a moment. And the Court was also required to consider evidence which militated against the reasonableness of the arresting officer's beliefs. Let's talk briefly about inferences. I think it's well settled and the Court would agree that the law requires that on a motion for summary judgment, all inferences that are reasonable be drawn in favor of the non-moving party, in this case, Ms. Medrano. I believe the lower court's order is replete with inferences that were drawn in favor of Appelese, inferences that disregarded what I contend, what the appellant contends, are reasonable inferences. Doesn't your client, okay, so we have the video. We have the video. We have certain timing that happens and we have certain clothing that when your client, when the police make contact with her, that match the description. We have certain identifications that take place to the officer and she happens to be married to the guy that is the person that gets arrested for the main thing. And I think even she says, well, it may look like me but not me type thing. But, you know, I'm not, I'm fatter than the person or I'm this, that or the other. But probable cause isn't the same as, you know, what we're talking beyond a reasonable doubt in what you choose to prove and that there are certainly, well, I think you're going to show the video or whatever, but there are instances that someone could make an inference that she was a lookout to the robbery. She certainly looks like the person that's in the robbery. She has clothing that matches the descriptions and she gets, doesn't, there's some photo identification too, right? With respect to whether all of that's true, Your Honor, I would disagree as to some of the factual conclusions. May I address them one by one? Well, but we have to go in the mind, you know, what are the officer, you know, what's undisputed about what the officer had at the time and then on those facts and if a reasonable officer would have thought that they had probable cause, you lose, right? Well, I would agree, but there's one caveat I would add, Your Honor, if I may. And that is that none of these officers in this case worked individually as an investigative or detective entity. Rather, they operate as a collective entity. And for this reason, they rely on the collective knowledge doctrine. That is, that the knowledge of one is imputed to all. Well, conversely, so much, so also must the lack of knowledge of one be imputed to all. As a hive mind, they only know what they know. And if I may address, Your Honor's excellent points, I think that we actually do have some disputes in the record that speak to these issues. First, with respect to the clothing. The record demonstrates that the officer who spotted Ms. Medrano allegedly, in fact, we contend it was another woman, alongside the road beside Miguel Hernandez, the armed robber, spotted her at a time when there was no description of the female suspect, only a description of the male. Subsequently, the next description that was provided identified the female as wearing a black sweatshirt. Officer Huff confirmed that the person he saw was wearing a black shirt. Later, after the surveillance video was reviewed by another officer, they radioed an updated description to Officer Huff and others indicating the female was wearing a red sweatshirt. Then, the record changes, and Officer Huff claims to have seen a female in a red sweatshirt walking beside Miguel Hernandez. We don't know what Officer Huff saw. We do know there was a red sweatshirt left, right? There was a red sweatshirt found. So we know that the officers drive up and they say to her, sit tight, and they know right at that location there's a red sweatshirt found. At some point prior to that location along the road, there is a sweatshirt found discarded. And, Your Honor, I'll also submit that there are significant and numerous facts in the record that dispute Officer's, excuse me, Officer Huff's account of telling the female suspect to wait there. In fact, his description in the police report varies significantly from his description of the events at deposition. Again, we can't know for certain what Officer Huff saw or said. However, this demonstrates that there is a legitimate factual dispute from which a jury could find that relying solely on Officer Huff's identification as the principal fact-supporting probable cause was not objectively reasonable because it failed to consider other facts that militated against that. Turning to the question of the photo identification, no doubt an officer picking Ms. Medrano out of a photo lineup is significant and has evidentiary value. However, I contend that the district court erred by failing to consider the contradictory evidence of another identification that did not select Ms. Medrano. The store clerk, Jagmeet Bains, under the bright fluorescent lights of a Circle K or a convenience store that we have in Arizona, saw this person point-blank just a few feet away from him. There was no gun. There was no reason to question the accuracy of his identification. Then, before Mr. Bains, the store clerk made an I.D. Did the officer review the video before he arrested? That's my precise point. They reviewed it with Mr. Bains, Your Honor. And before Mr. Bains made his identification, he saw the female live and in person. Then he watched the video of the event. But did the officer review the video before he arrested your client? Officer DeVenti. Not the officer who arrested my client. A different officer, yes. But the record is missing any evidence, Your Honor, that Officer DeVenti ever saw Ms. Medrano. And that's a key point. To the extent identifications exist, Officer Huff's photo lineup identification, Mr. Bains's photo lineup identification, or Officer Huff's identification roadside, they were all made in comparison to a photo, an MDD photo of Ms. Medrano from four years earlier when she was approximately 40 pounds lighter and before she had ever had her first child. At the time of this incident, she was seven weeks postpartum. She looked significantly different than the 19-year-old girl at 170 pounds that was reflected in her MDD photo. So at most, Your Honor, to the extent we have identifications, the folks in this case identified a photograph of a person that was four years old. I guess, you know, I guess I think these are all great arguments to a jury if you got to that point. But this goes to probable cause. And I, you know, I have to confess that in looking at all of this, that it's, to me, it falls on the more shocking side of someone bringing in 1983 that she was lucky she didn't get prosecuted for the robbery because it doesn't, she doesn't appear to be factually innocent. They dismissed it in the interest of justice. But there's a lot of, I'm not at all sure that a jury wouldn't have convicted her. Respectfully, Your Honor, I disagree. But since my time is short, let me attempt to change your mind on one point. It's a little, it just seems like, you know, that I'm shocked that she isn't relieved that she didn't get charged with that. And now this seems to be, I'm just putting my hand out there for you. I have two points on that. Number one, Your Honor, I don't believe that she would have been convicted. And we can discuss it at length, but I don't have time. Nonetheless, I will share two facts. The first is that when Ms. Medrano was contacted by police on May 21st, she cooperated entirely. She provided a full statement. She gave samples of her DNA and samples of her fingerprints to prove her innocence and to exonerate herself. And in fact, that evidence did not indicate in any way that she was involved in the crime. Second, Your Honor, before I run out of time, let me address the issue of intent because I think that is clear. Appleby's in their brief acknowledged that in Torres v. City of Los Angeles, the Ninth Circuit held that Mr. Torres allegedly flashing a gang sign in a photo was not evidence of his intent to commit the crime of a drive-by when he was a passenger in a car that performed a gang-related drive-by. But in Torres, if you're relying on Torres, we found that there were serious flaws in the photo identification used by the police. Were any of those flaws in the photo identification used by the police in this case? We have an affidavit from our expert, Donna Quist, in which I believe is part of the record, although I don't know if it's part of our record on appeal, Your Honor. And I'm happy to submit that in a letter to the court. But she did raise concerns. Well, one difference in Torres is that the witness doing the identification took quite a while, like 10 minutes to identify. And then also the very big difference is there was no evidence of acting in concert like we have here and shown in the video. So in my mind, it's a little harder for you to rely on Torres. There may be better cases. I'm certainly open to hearing those. Your Honor, before I speak to the better cases, let me simply suggest that the facts of this case were more complex. There was another identification. It was by Mr. Baines, and it was not of Ms. Medrano. And he arguably had better circumstances by which to view her. He was not roadside in a gun-drawn showdown with a suspect who he suspected was armed. He had a much better opportunity than Officer Huff. Additionally, Your Honor, and I think this is important, the district court disregarded certain facts that militate against an objective finding of intent to commit the crime. The cases are clear that specific intent is required for the armed robbery. These are the facts. The district court found that the female could have expressed evidence for intent to participate in the armed robbery by acting as a distraction. I believe Ms. Burke will show you the video of this event. And what you'll see is that during the portion of time when Mr. Hernandez is walking behind the counter, in six of the nine frames, if we go frame by frame, the female was pointing at him. And the clerk was looking behind himself to Mr. Hernandez. So the inference that the female was acting as a distraction, whoever that female was, is quite frankly, in my opinion, unreasonable. Because if you're acting as a distraction for Mr. Hernandez, common sense says you don't point at Mr. Hernandez while you're attempting to distract from him. Asking for a cup of water, which is the other thing the female is alleged to have done, is not in and of itself evidence of an intent. And most importantly, these two facts. Once the female sees Mr. Hernandez reveal, by lifting his sweatshirt, a gun in his waistband, her immediate first move is to cover him up and then immediately say, don't, don't, which the clerk testified was an expression to him of an attempt to stop a robbery, and then walk out of the store. And waits for him. She paces in what's called the pastor area on the camera, back and forth, looking exceedingly nervous. I don't, I mean. I don't know. If I was in a store and somebody or anyone pulled a gun, I don't think I'd hang out waiting for the gun, you know, pointer to saunter out of the store. I mean, it's certainly, it doesn't, it's not consistent with not being in concert. Your Honor, I have a minute remaining. I'd like to reserve the remainder of time. Thank you. But I will say one thing, which is simply that the bench has raised excellent points today. And I believe that those are countervailing facts that a jury must resolve. And that is what Ms. Medrano is entitled to. Nothing more at this point. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Lori Burke. I'm here with my partner, Jody Corbett. And we represent Phoenix police officers, Robert DeVenti, David Huff, Benjamin Denham, Pamela Zeland, Michael Moeller, and Thomas Baker. First, I'd like to, you know, start out with an important point that our United States Supreme Court made. And that is that the Constitution does not guarantee that only the guilty will be arrested. As the, as Your Honors pointed out, all that is required is, for arrest, is probable cause. And I want to correct some errors that Mr. Kuhl made in describing the facts of what took place. He stated that Officer Huff never confirmed that the, or he stated that the, his observation of the female that he saw was that she was wearing a black shirt. He never stated that she was wearing a black shirt. If you look at his supplement, which is excerpt of the record ER-195, he states in the report he prepared that he saw the Hispanic male with a heavyset Hispanic female wearing a red Diamondbacks pullover windbreaker. He never stated that she was wearing black. So clearly he saw the woman that was in the video. When he was interviewed by, or when he participated in the defense interview in September of 2011, he said the same thing. He's been consistent the entire time. Let's, okay. I think I asked the question early on about, let's, we have the video. We have certain things that are facts. It appears to me that Appellant is asking, is saying that you can draw different inferences. For example, the showing of the gun and seeming to go that, does that mean don't do the robbery? Does that mean don't shoot in the robbery? You know, there's different ways that you could look at it. The video sort of speaks for itself. But because a jury could make different inferences on that point, how does that relate to the facts and probable cause? Your Honor, the case law is very clear that all that is required is that the officer's inferences be reasonable. There can be a variety of reasonable inferences to be drawn from the undisputed historical facts, which we have here. And as long as the officer's inferences are reasonable, then summary judgment is appropriate. And the officer's inferences here were reasonable. Mr. Kuhl stated to the court that as soon as Mr. Hernandez displayed the gun to the clerk, Ms. Medrano said, don't, don't. And she turned around and immediately left the store. That is not what occurred. We don't know at what point she said don't, don't, because there's no audio to the video. But we do know when it is that she left the store. We know that they walked in together. And then I'm going to show the video of Mr. Hernandez when he displays the weapon to the clerk. And then I'll show you at what time he pulls the gun. And then we'll look at a different view of the same period of time. And what the court will see is that Ms. Medrano did not walk out of the store until he actually pulled the gun. So when he displayed it, she remained there and participated in the robbery. And then it wasn't until she thought he was actually going to shoot the gun that, as Your Honor pointed out, she never left. She stood by as a lookout for Mr. Hernandez and watched the rest of the robbery. And then we'll show you another court. That's an inference, right? That she was, well. That she's a lookout. I mean. She's a lookout. All we know is she's outside the store. She doesn't leave. That's what we know. And she keeps looking in. And so she's watching, which is a reasonable inference would be she's participating in this robbery and is waiting for him. And then you'll also see on these two video clips we're going to show you that once the armed robbery is completed, Mr. Hernandez looks out the window, says to her, let's go. And then they meet up and they leave, as you see in the exterior video. So let's take a look at the Position B video. I believe it's Position B. It's over. And you'll see Mr. Hernandez walking behind the counter. She's covering her face, which the officer reasonably inferred is she's aware that there's cameras there. So right there is when he displays the gun for the clerk. And what time that was at? 938. 90738. So let's go back there. Okay, so we started at 90738. So that's when he had displayed the gun. So he's displayed the gun seconds before she leaves. She's still there after he's displayed the gun. And she doesn't turn to leave until 90750. So she's there for another 12 seconds after the gun is initially displayed to the clerk, which would make it reasonable to infer that she was fully aware and participating in this armed robbery, knew there was a gun involved, and that it wasn't until he actually pulls it out and she thinks he's going to use it to kill the clerk that she walks out of the store. And then if we continue running this clip, let me get back to the prior clip, you'll see the rest of the crime completed, and then you'll see Mr. Hernandez signal to her, let's go. Right there, he's telling her, let's go, we're done, let's get out of here. And then we'll look at the outside view. He's clearly watching the armed robbery take place. And they leave together. And then Officer Huff sees them walking together, and he stops them, and he pulls his gun. And he describes this during his defense interview, which took place in September of 2011, which is part of our supplemental excerpt of record. Mr. Kuhl had that transcribed. And Officer Huff described how he pulled his gun out, aimed it at them, got a good look at her for up to 20 seconds, and then when the mail took off running, he decided to go after him because he was the one that was reportedly armed, and he told Ms. Medrano to stay put. He's been consistent with that all along. And then when he returned, she had discarded the red diamondback sweatshirt. In terms of Mr. Baines selecting the wrong individual in the photo lineup, the fact that he selected a filler in both the male photo lineup and the female photo lineup demonstrates that he has a poor memory of the events that took place. On his call to 911, which there's also a transcript of that in the supplemental excerpt of record, he states to the 911 operator, I'm so confused. And in the description, he gives to them. Well, okay, that he has a poor memory, that's an inference. Okay, facts are the photo lineup, who he picked, and that he didn't pick Medrano, right? Right. And he didn't pick. So that's what I'm distinguishing between. So the inference you're making is you're saying a reasonable officer could make the inference with everything that they have there, that they're not able to say what happened, but they looked at the video, they know what they saw, and that it's still probable cause. Right, and so I'll address the reasonableness of that inference. But there could be different, you know, but if you went to a trial, someone would argue, well, that he couldn't identify him, and then say, well, the officer says that this person, you couldn't identify him, who's right? And then a jury would look at the video, and they would decide. Correct. So the question is really what, you know, I think the inferences, your argument I'm hearing you say is the inferences can be different, but it's what a reasonable officer would have inferred. Right, there can be several different reasonable inferences from the same historical facts. But the counsel for the appellant is saying if you have different inferences, that defeats summary judgment for qualified immunity. It does not. And the case law is clear that there can be a variety of different inferences. And as long as the inferences made by the police officers are reasonable, summary judgment is appropriate. And that is, I believe, the Hart case, Hart v. Parks. The quote from Hart v. Parks, facts may always give rise to a variety of inferences, yet it is settled law that officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. The fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause. And Officer Baker in his declaration states that in his experience, when a witness, an eyewitness, selects fillers, as opposed to saying I just don't see the person in this photo lineup, but when they actually pick a filler, that demonstrates that they have a poor memory of the events. And that is backed up by scientific evidence. We attached the declaration from our eyewitness identification expert, John Wickstead, and he states, and he cites to the scientific evidence that supports that, that when a witness selects a filler, it means they have a poor memory. And the fact that we know Miguel Hernandez committed the armed robbery, that's undisputed. And so the fact that he picked the wrong man in the photo lineup clearly shows he has a poor memory of the events because we know with 100% certainty that Miguel Hernandez was involved in the armed robbery. So I don't think that really changes the equation. And we have a police officer, DeVenti, who views the one photo, says that's definitely her, and then that photo is used in a photo lineup, and when Officer Huff is shown the photo lineup, he states immediately that's her, that's the woman I saw. And when the scientific evidence that John Wickstead cites in his report also states that when there's high confidence selection of a person in a photo lineup, that tends to show reliability. Would you answer one issue that we've not touched on here, and that's the statute of limitations issue, because I would like to ask counsel that as well. Sure. Under Wallace v. Cato, it's clear that the accrual of the statute of limitations for a false imprisonment claim accrues at the time legal at the time there's been legal. Tension? The initial appearance where there's been a probable cause determination by the court. So in your view, was the district court wrong in pegging it to probable cause? The district court didn't rule on the issue of statute of limitations. What the court stated in her order was that she didn't need to reach that issue because she found probable cause to exist. So statute of limitations was not ruled on. Early on we had filed a motion to dismiss based on statute of limitations, and she denied it, but it's not the law of the case because the factual record needed to be developed. And during discovery, we confirmed that the initial appearance where the court found probable cause. Well, isn't the language requisite legal process or something in Wallace? Yeah. I apologize. It says, I think, pursuant to such process requisite. I mean, as I understood, the district court denied the motion because it was being pegged to probable cause. So the question is, does the detention without legal process and pursuant to such process, is that tantamount to a probable cause, or does the Supreme Court mean something different? I don't know that I'm understanding your question. Well, I'm using the Supreme Court's language. On the same day as her arrest, she became held over pursuant to legal process at her initial appearance. And so that is when the accrual of the statute of limitations begins to run. So you're using, okay, the plaintiff was brought before a magistrate on May 21st. Right. All right. And the parties refer to this appearance as an arraignment. And then the state court docket says it was actually an initial appearance pursuant to Arizona rule of criminal procedure 4.2. So although we don't know exactly what happened on that date, no formal complaint was filed until three days later, and the plaintiff was not arraigned until June 10th. Right. But under that rule, the court is required to make a determination of probable cause, and we cite to the language of that rule in our brief. And then we did requests for admission to Ms. Medrano, asking her to admit that probable cause was determined that day, and she admitted that it was. Thank you. Okay. I want to get a quick question. Thank you, Your Honor. Not to her. Oh, not to her. Okay. A quick question, Mr. Coole. Do I understand your argument that the lady that we just saw in this video, there was no probable cause to believe that she was in that store to assist in the robbery? That's my contention, yes. Okay. That's your contention. And then your next contention is that even if it was the plaintiff in that store not involved with the robbery, well, your next contention would be that wasn't the plaintiff to begin with, no reasonable cause to believe that the person in the store was the plaintiff. Is that correct? To clarify, I believe that it was not the plaintiff, and that even if it was the plaintiff, there's no evidence of intent. Okay. Thank you. Briefly, I have six seconds, but if I'd like to just perhaps go ten seconds over, Your Honor, I don't need much more. Thank you. As to your request for additional authority, rather than Torres, may I point the court to Gasho v. United States, which appears in the papers? That is 39F3-1420, specifically at Head Note 23 in Westlaw. I think the page is in my briefs. I apologize. And also United States v. Moore, 483F2-1361 at 1363 for the principle that probable cause is lacking if the circumstances relied upon are susceptible to a variety of credible interpretations not compatible with nefarious activities, which is precisely what I contend is the case here. Lastly, Your Honor, if I may wrap up, just three brief facts, which is that no identification of the person in custody, the physical human, was ever made, only a photo. No argument – sorry, there's never been an agreement about what description of the suspect Ms. Medrano allegedly matched. The officer who did that comparison didn't recall what he compared it to. And to the extent the Court is interested, Miguel Hernandez, this is not part of the record, but if the Court is interested as to why he has not opined on this issue or weighed in, I tend to agree with that. I don't think we're – he's not in the lawsuit here. Very well. Thank you very much. Thank you. I appreciate it. The case of Medrano v. DeVenti is submitted. Thank both counsel for coming from Phoenix to argue the case.
judges: McKeown, Callahan, Quist